561 A.2d 1281

**In re Condemnation by the Erie Municipal Airport Authority of Certain Properties in Millcreek Township, Erie County, Commonwealth of Pennsylvania.**

**ERIE MUNICIPAL AIRPORT AUTHORITY, Appellant,**

**v.**

**Louis J. AGOSTINI, Norman J. Cutri and Riviera Estates, Appellees. (Two Cases)**

Commonwealth Court of Pennsylvania.

Argued May 1, 1989.

Decided July 3, 1989.

Petition for Allowance of Appeal Denied March 15, 1990.

Wallace J. Knox, Knox, McLaughlin, Gornall & Sennett, P.C., Erie, for appellant.

David W. Murphy, Pittsburgh, for appellees.

Before COLINS and McGINLEY, JJ., and BARBIERI, Senior Judge.

BARBIERI, Senior Judge.

Erie Municipal Airport Authority (Authority) appeals the orders of the Erie County Court of Common Pleas dated November 10, 1988 and December 7, 1988 [1] which respectively dismissed the Authority's preliminary objections to the petition for appointment of viewers (petition) filed by Louis J. Agostini, Norman J. Cutri, and Riviera Estates (Appellees) [2] and sustained Appellees' preliminary objections to the Authority's declaration of taking. Issues presented for review are whether the trial court applied the appropriate statute of limitations in determining that Appellees' petition was timely filed; whether the evidence was sufficient to establish a *de facto* taking; and whether Appellees' preliminary objections to the Authority's declaration of taking were properly sustained. The trial court's rulings are affirmed.

1. These appeals were consolidated by order of this Court dated January 30, 1989 and docketed at Nos. 2839 C.D. 1988 and 3023 C.D. 1988, respectively.

2. Agostini and Cutri are partners who operate Riviera Estates, a mobile home park.

In 1972 or 1973, Appellees purchased property upon which they constructed a mobile home park. The Erie International Airport (airport), which is owned by the Authority, had been operating for several years prior to Appellees' acquisition of the subject property and had been updating the runway at issue since 1968. The final alteration to this runway, a 500–foot extension, became operable on November 13, 1978 and placed the end of the runway less than 2000 feet from Appellees' property. This runway accommodates large commercial jet traffic and 90% of all other aircraft traffic.

Appellees initiated the matter docketed at No. 2839 C.D. 1988 on November 23, 1987 by filing a petition in the trial court for appointment of viewers, alleging that the Authority had effected a *de facto* taking of their property. Appellees claimed that aircraft arriving at and departing from the airport's primary runway denied them the quiet use and enjoyment of their property. The Authority filed preliminary objections raising the issues of whether there was a *de facto* taking and whether Appellees' petition was timely filed. After a seven-day evidentiary hearing, the trial court determined that Appellees' petition was timely filed and that the Authority effected a *de facto* taking of Appellees' property on November 13, 1978, the date on which the 500–foot runway extension became operable.

On October 3, 1988, the Authority initiated the action docketed at No. 3023 C.D. 1988 by filing a declaration of taking in the trial court, seeking an avigational easement over Appellees' property. Appellees filed preliminary objections asserting that the Authority could not take *de jure* what it had previously taken *de facto*. By order dated December 7, 1988, the trial court sustained Appellees' preliminary objections, whereupon the Authority appealed to this Court for review of both trial court rulings.[3]

3. This Court's scope of review where the trial court dismisses preliminary objections to a petition for appointment of viewers is to determine whether the trial court committed an abuse of discretion or error of law. Moreover, the trial court's findings of fact, if supported

■ The Authority asserts that the trial court abused its discretion and committed legal error in not finding Appellees' petition barred by the six year limitations period of Section 5527 of the Judicial Code (Code), 42 Pa.C.S. § 5527,[4] since Appellees' property was injured and not taken.[5] Appellees, on the other hand, contend that the trial court properly applied the twenty-one year limitations period of Section 5530 of the Code, 42 Pa.C.S. § 5530,[6] as their property was taken without just compensation. The issue of which limitations period governs here is contingent upon whether the evidence supports the trial court's ultimate finding that a *de facto* taking occurred on November 13,

by substantial evidence, will not be disturbed. *McGaffic v. Redevelopment Authority of the City of New Castle*, 120 Pa. Commonwealth Ct. 199, 548 A.2d 653 (1988). Similarly, where the trial court sustains preliminary objections to a declaration of taking, this Court's scope of review is to determine whether the trial court abused its discretion or committed an error of law. *Pennsylvania Department of Environmental Resources Appeal*, 91 Pa. Commonwealth Ct. 381, 497 A.2d 284 (1985).

4. During the relevant time frame, Section 5527(4) of the Code provided in pertinent part that:

The following actions and proceedings must be commenced within six years:

(4) A proceeding in inverse condemnation, if property has been *injured but no part thereof has been taken*, ... (Emphasis added.) This section was subsequently amended by Section 201 of the Act of December 20, 1982, P.L. 1409, which eliminated subsection 4 and created a similar provision with a five year limitations period now found at Section 5526(4) of the Code, 42 Pa.C.S. § 5526(4).

5. The Authority also asserts that a taking, if any, occurred in 1971, the year of the highest total aircraft operations; and therefore, Appellees' petition was barred prior to the effective date of Sections 5527 and 5530 of the Code by the six year limitations period of Section 524 of the Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended, formerly* 26 P.S. § 1–524, repealed by the Act of April 28, 1978, P.L. 202, 42 P.S. § 20002(a) [1376], with the effective date of repeal being June 27, 1978. This argument is specious. Appellees did not own the subject property in 1971. Moreover, as will be discussed *seriatim*, the *de facto* taking of Appellees' property occurred after the effective date of repeal of Section 524 of the Eminent Domain Code.

6. Section 5530(a)(3) of the Code states in relevant part that:

(a) *General rule.*—The following actions and proceedings must be commenced within 21 years:

(3) A proceeding in inverse condemnation, if property has been *taken* and the condemnor has not made payment ... (Emphasis added.)

1978. Because the trial court's ruling is so supported, as will be discussed *seriatim,* Section 5530 of the Code was properly applied by the trial court in finding Appellees' petition timely. *See Carmichaels Mining Machine Repair Co. Appeal,* 88 Pa.Commonwealth Ct. 541, 490 A.2d 30 (1985).

■ Review of *de facto* condemnation cases, as here, must be conducted on a case-by-case basis with resolution thereof predicated upon the totality of the evidence presented. *Westmoreland County Airport Authority Appeal,* 96 Pa.Commonwealth Ct. 306, 507 A.2d 899 (1986). Accordingly, no single factor in isolation is dispositive. *Id.*

■ *De facto* takings occur when the activities of condemnors substantially deprive property owners of the beneficial use and enjoyment of their property. *Allegheny County Appeal,* 63 Pa.Commonwealth Ct. 99, 437 A.2d 795 (1981). Aircraft flights over private property may effect a taking of that property if they are so low and frequent as to be a direct and immediate interference with the enjoyment and use of that property. *Griggs v. County of Allegheny, Pennsylvania,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).

The Authority contends that no evidence was presented to establish substantial deprivation of the enjoyment and use of the subject property as commercial property. In support, the Authority urges this Court to adopt the rationale found in a myriad of cases [7] addressing allegations of *de facto* takings in the context of income-producing commercial properties. That rationale emphasizes the effect of the alleged condemnor's activity upon the financial viability of the commercial property claimed to have been taken.

7. *See,* e.g., *Conroy–Prugh Glass Co. v. Department of Transportation,* 456 Pa. 384, 321 A.2d 598 (1974); *McGaffic v. Redevelopment Authority of the City of New Castle,* 120 Pa. Commonwealth Ct. 199, 548 A.2d 653 (1988); *Filbert Limited Partnership Appeal,* 64 Pa. Commonwealth Ct. 605, 441 A.2d 1345 (1982); *Miller Appeal,* 55 Pa. Commonwealth Ct. 612, 423 A.2d 1354 (1980).

■ This suggested analytical approach, however, ignores the residential use of Appellees' property. Whether property owners have been substantially deprived of the beneficial use and enjoyment of their property as a consequence of activities by alleged condemnors is dependent upon the type of use property owners have made of their property. *See Department of Transportation v. Kemp,* 100 Pa.Commonwealth Ct. 436, 515 A.2d 68 (1986).

In *Causby,* although the property owners resided on the property, the highest and best use of that property was as a chicken farm. The United States Supreme Court thus emphasized the destruction of the commercial use of that property in discussing whether military aircraft flights effected a taking thereof. However, unlike a chicken farm, a mobile home park, as here, possesses residential characteristics which distinguish this case from *Causby.* Moreover, in *Westmoreland County Airport Authority Appeal,* this Court addressed the issue of a *de facto* taking of property with apparent residential and commercial uses. That property's financial viability as a commercial enterprise was neither discussed nor relied upon to affirm the trial court's finding of a *de facto* taking.

Appellees' commercial enterprise is intricately entwined with and absolutely dependent upon the residential use of their property. Absent such residential use, their mobile home park would be nonexistent. It is thus the interference with the residential enjoyment and use of this property which is of utmost concern. Any evidence of financial impairment to the commercial enterprise would merely constitute but one factor that could be used as further support for a finding of a *de facto* taking. Absence thereof, however, is not dispositive under the instant circumstances.

Here, the trial court concluded that the 1978 runway extension caused aircraft flights over Appellees' property sufficiently low and frequent to constitute a direct and immediate interference with their enjoyment and use of the subject property. The trial court accepted as credible the testimony of Appellees' witnesses, Ronald L. Thompson,

Chris E. Ganas, and James A. Means, all of whom are or were airline pilots familiar with the airport, in finding that the runway extension resulted in significantly lower altitude approaches and departures over Appellees' property, with approaches being at an altitude as low as 120 feet. N.T., April 6, 1988 Hearing, pp. 102–104, 106–107, 110, 130–131, 137–138, 141, 144, 156–158, 163–164. The trial court further found that the runway extension prompted an increase in aircraft traffic; that the centerline of the runway is less than 300 feet from Appellees' property; that the airport accommodates a variety of aircraft, including several large private and commercial aircraft such as the DC9, BAC 1–11, and Boeing 737; that, in 1977, combined propellor/prop jet aircraft and jet aircraft landings per month were 340.4 with an increase to 572.2 in 1987; and that mobile homes are more susceptible to noise pollution than are conventional structures. N.T., April 6, 1988 Hearing, pp. 18, 165–168; Defendant's Exh. 37; Petitioner's Exh. 35. Moreover, the trial judge noted that, while viewing the sites in question, he observed aircraft approaching at low altitudes, felt the vibrations, and heard the noise.[8]

These findings, supported by substantial record evidence, together with the trial judge's personal observations and the undisputed frequent use of this runway, form a sufficient basis for the trial court's determination that the Authority effected a *de facto* taking of Appellees' property. *Compare Westmoreland County Airport Authority Appeal; Allegheny County Appeal. Contrast Petition of Ramsey*, 31 Pa.Commonwealth Ct. 182, 375 A.2d 886 (1977).[9]

---

**8.** Credibility determinations and resolution of evidentiary conflicts are for the trial judge as factfinder. Moreover, a trial judge's view of the sites in question is to be accorded substantial weight. *Allegheny County Appeal; Croop Estate v. Department of Transportation*, 38 Pa. Commonwealth Ct. 305, 393 A.2d 41 (1978).

**9.** In *Westmoreland County Airport Authority Appeal* (Westmoreland) and *Allegheny County Appeal* (Allegheny), this Court affirmed the respective trial courts' findings of *de facto* takings. The affected properties in *Westmoreland* were located 5504 feet from the end of the runway in question and aircraft passing over the properties were at

■ With respect to the final issue, the avigational easement described in the Authority's declaration of taking is the same easement that the Authority acquired *de facto* on November 13, 1978. The trial court thus properly sustained Appellees' preliminary objections to the Authority's declaration of taking.

Accordingly, having found no error of law nor abuse of discretion, the trial court's orders dated November 10, 1988 and December 7, 1988 are affirmed.

## ORDER

AND NOW, this 3rd day of July, 1989, the orders of the Court of Common Pleas of Erie County dated November 10, 1988 and December 7, 1988 are affirmed.

altitudes ranging from 279 to 291 feet with no regularly scheduled flights of the DC9 and 737 class, as here. In *Allegheny,* uncontradicted testimony by the property owners, which was accepted as credible by the trial court, established a substantial increase in aircraft flights over the subject residential properties with a concomitant rise in noise levels and exhaust pollution as well as diminution in the properties' market values. By contrast, the private property in *Petition of Ramsey* was located 3228.26 feet from the end of the runway at issue with aircraft passing by the property at altitudes between 260.34 and 263.38 feet. Moreover, the complaints of the property owners therein focused primarily upon small private jet aircraft, averaging only three to five arrivals and departures per day, with nominal use of the airport by regularly scheduled commercial jets.